# 20-3401-CR

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

➤➤◀◀

UNITED STATES OF AMERICA,

*Appellee,*

*v.*

ADAM J. MANSON,

*Defendant,*

*and*

BRIAN R. CALLAHAN,

*Defendant-Appellant.*

*On Appeal from the United States District Court
for the Eastern District of New York*

## BRIEF FOR DEFENDANT-APPELLANT

Andrew J. Frisch
SCHLAM STONE & DOLAN LLP
*Attorneys for Defendant-Appellant*
26 Broadway
New York, New York 10004
212-344-5400

Table of Contents

**Page**

Table of Authorities ................................................................................. iii

Statement of the Case and Jurisdictional Statement ..................................................1

Question Presented and Standard of Review ..................................................2

Introduction ..................................................3

The Relevant Facts ..................................................6

    1.   Callahan's Emergency Application..................................................6

    2.   The Government's Opposition ..................................................10

    3.   Callahan In Reply Addressed The Government's
        Objections..................................................11

        a.   The Medical Opinion of Mark Shoag, M.D. ..................................................12

        b.   Mr. Callahan's Extraordinary and Compelling
            Family Circumstances ..................................................20

        c.   The District Court Ignored The First Step Act's Earned
            Time Credit Program, Which Itself Might Have
            Reduced His Sentence By At Least Half But For
            The Pandemic ..................................................24

        d.   The District Judge Failed to Conduct the Required
            Resentencing ..................................................27

    4.   Judge Brown's Application of The Wrong Standard
        and Arbitrary Ruling ..................................................36

Summary of the Argument..................................................37

Argument..................................................38

ii

Conclusion ........................................................................................43

Certificate of Compliance ......................................................44

ii

Table of Authorities

**Page(s)**

**Cases**

*Chavez-Meza v. United States,*
138 S. Ct. 1959, 1966-67, 201 L. Ed. 2d 359 (2018).......................................41

*Chunn v. Edge,*
20-CV-1590, Docket No. 72 (E.D.N.Y.) ........................................................9

*Goodman v. Ortiz,*
2020 U.S. Dist. LEXIS 153874 (D.N.J. Aug. 25, 2020) ................................25

*Nielsen v. Wilkie,*
2019 U.S. App. Vet. Claims LEXIS 1232
(Vet. App. July 16, 2019)................................................................................16

*United States v. Arango,*
2020 U.S. Dist. LEXIS 113059 (S.D.N.Y. June 26, 2020) .............................31

*United States v. Blye,*
2020 U.S. Dist. LEXIS 101795 (W.D. Wash. June 9, 2020) ..........................21

*United States v. Brooker,*
976 F.3d 228 (2d Cir. 2020)......................................................................*passim*

*United States v. Brown,*
2020 U.S. Dist. LEXIS 90187 (E.D. Pa. May 22, 2020)............................31, 32

*United States v. Bucci,*
409 F. Supp. 3d 1 (D. Mass. 2019) .................................................................20

*United States v. Ebbers,*
432 F. Supp. 3d 421 (S.D.N.Y. 2020)...............................................................4

*United States v. Elliott,*
2020 U.S. Dist. LEXIS 136583 (E.D.N.Y. July 31, 2020).............................35

*United States v. Gunn,*
2020 U.S. App. LEXIS 36612 (7th Cir. Nov. 20, 2020) ..................................3

*United States v. Haynes*,
   2020 U.S. Dist. LEXIS 71021 (E.D.N.Y. Apr. 22, 2020) ................................35

*United States v. Holloway*,
   956 F.3d 660 (2d Cir. 2020).........................................................................2

*United States v. Hope*,
   2020 U.S. Dist. LEXIS 130617 (S.D. Ga. July 22, 2020) ..............................15

*United States v. Jackson*,
   2020 U.S. Dist. LEXIS 71601
   (S.D. Tex. Apr. 23, 2020) ..............................................................................32

*United States v. Jones*,
   2020 U.S. App. LEXIS 36620 (6th Cir. Nov 20, 2020) .........................3, 41, 41

*United States v. Karr*,
   2020 U.S. Dist. LEXIS 27149 (E.D. Ky. Feb. 18, 2020) ..........................32, 40

*United States v. Keefer,*
   No. 19-4148, 2020 U.S. App. LEXIS 32723, 2020 WL 6112795
   (6th Cir. Oct. 16, 2020) ..................................................................................41

*United States v. Kissi*,
   No. 13-CR-51, 2020 U.S. Dist. LEXIS 118956
   (E.D.N.Y. June 26, 2020)..........................................................................26, 31

*United States v. Lisi*,
   2020 U.S. Dist. LEXIS 31127 (S.D.N.Y. Feb. 24, 2020)................................20

*United States v. Marks*,
   2020 U.S. Dist. LEXIS 68828 (W.D.N.Y. Apr. 20, 2020) ..............................29

*United States v. McCoy*,
   2020 U.S. App. LEXIS 37661 (4th Cir. Dec. 2, 2020).....................................3

*United States v. Millan*,
   2020 U.S. Dist. LEXIS 59955 (S.D.N.Y. Apr. 6, 2020)..................................30

iv

*United States v. Pacheco*,
No. 12-CR-408, 2020 U.S. Dist. LEXIS 134510
(S.D.N.Y. July 29, 2020) ......................................................................19, 30

*United States v. Riley*,
2020 U.S. Dist. LEXIS 82909 (D. Vt. May 12, 2020) ....................................20

*United States v. Rountree*,
2020 U.S. Dist. LEXIS 91064 (N.D.N.Y. May 18, 2020)................................19

*United States v. Ruffin,*
978 F.3d 1000, 2020 WL 6268582 (6th Cir. 2020) .........................................41

*United States v. Sanchez*,
2020 U.S. Dist. LEXIS 70802................................................................15, 30

*United States v. Schafer*,
2020 U.S. Dist. LEXIS 86834 (W.D.N.Y. May 18, 2020)...............................18

*United States v. Shaw*,
957 F.3d 734 (7th Cir. 2020)........................................................................42

*United States v. Smith*,
2020 U.S. Dist. LEXIS 129218 (W.D. Pa. July 20, 2020) ..............................26

*United States v. Thaqui*,
No. 1:11-cr-00486, Docket No. 2031
(E.D.N.Y. June 16, 2020)............................................................................21

*United States v. Zoquier-Solano*, No. 13-cr-772,
2020 U.S. Dist. LEXIS 142598 (S.D.N.Y. Aug. 10, 2020).......................19, 30

*Wragg v. Ortiz,*
No. 20-5496, 2020 WL 2745247 (D.N.J. May 27, 2020)................................19

## Statutes

18 U.S.C. § 3553(a) ..................................................................................*passim*

18 U.S.C. § 3553(a)(6)......................................................................................35

18 U.S.C. § 3582................................................................................................32

18 U.S.C. § 3582(c)(1)(A) ..................................................................41

18 U.S.C. § 3582(c)(1)(A)(i) ......................................................1, 2, 3

18 U.S.C. § 3624(b) ..........................................................................25

18 U.S.C. § 3624(g) ..........................................................................26

18 U.S.C. § 3632(d)(4)(A) ................................................................25

18 U.S.C. § 3632(d)(4)(C) ................................................................25

United States Code, Title 28, § 1291 ...................................................1

U.S.S.G. § 1B1.13.........................................................1, 2, 20, 39, 40

U.S.S.G. § 1B1.13(A)(i) ....................................................................36

U.S.S.G. § 5H1.4...............................................................................33

**Rules**

H.R. 6800, 116th Cong., 2d Sess ........................................................17

**Other Authorities**

7 Day Home Care (http://7dayhomecare.com/)......................................23

https://www.bop.gov/inmateloc/
(consulted Aug. 17, 2020; confirmed Dec. 12, 2020)......................25

*https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/
immunocompromised.html.* .............................................................7

*https://my.clevelandclinic.org/about)* .................................................12

*https://docs.house.gov/billsthisweek/20200511/
BILLS-116hr6800ih.pdf*, pp. 1688-1689 .......................................17

*https://www.healthline.com/health/autoimmune-disorders*.....................7

Office of the Inspector General U.S. Department of Justice,
"Review and Inspection of Metropolitan Detention Center
Brooklyn Facilities Issues and Related Impacts on Inmates"
(Sept. 2019) *available at https://oig.justice.gov/
reports/2019/e1904.pdf*].................................................................32

U.S. Sentencing Commission Quarterly Data Report
for the Year 2017, p. 9, available at *https://www.ussc.gov
/sites/default/files/ pdf/research-and-publications/
federal-sentencing-statistics/quarterly-sentencing-updates
/USSC-2017_Quarterly_Report_Final.pdf* ......................................34

Statement of the Case and Jurisdictional Statement

Defendant-Appellant Brian Callahan appeals from a memorandum and order of the United States District Court for the Eastern District of New York (Brown, J.), denying his motion for relief under the First Step Act of 2018, Pub L. 115-391, 132 Stat. 5194;18 U.S.C. §3582(c)(1)(A)(i). The District Court had jurisdiction under Title 18 of the United States Code. This Court has jurisdiction under Title 28 of the United States Code, Section 1291, as a final decision of a district court.

Question Presented and Standard of Review

May a district judge deny a motion for relief under the First Step Act of 2018 [18 U.S.C. § 3582(c)(1)(A)(i)], which requires a fulsome and firsthand evaluation of proffered circumstances, based on the restrictive standard of U.S.S.G. § 1B1.13 and a predecessor judge's consideration of the statutory sentencing factors under 18 U.S.C. § 3553(a)?

Whether a district court should have considered extraordinary and compelling circumstances beyond those listed in U.S.S.G. § 1B1.13 is a legal question to be reviewed *de novo*. *United States v. Brooker*, 976 F.3d 228, 234 (2d Cir. 2020) (remanding denial of motion for further proceedings) (*citing United States v. Holloway*, 956 F.3d 660, 664 (2d Cir. 2020)).

Introduction

In *United States v. Brooker (Zullo)*, 976 F.3d 228 (2d Cir. 2020), this Court confirmed that the First Step Act of 2018 [Pub L. 115-391, 132 Stat. 5194;18 U.S.C. §3582(c)(1)(A)(i)] (the "Act"), "freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." *Id.* at 237. *Accord United States v. McCoy*, 2020 U.S. App. LEXIS 37661, at *30-32 (4th Cir. Dec. 2, 2020); *United States v. Gunn,* 2020 U.S. App. LEXIS 36612, at *2-5 (7th Cir. Nov. 20, 2020); *United States v. Jones,* 2020 U.S. App. LEXIS 36620, at *19 (6th Cir. Nov. 20, 2020).

The extraordinary and compelling reasons supporting Defendant-Appellant Brian Callahan's emergency application presented to Judge Brown pursuant to the Act [A30-35, 58-122[1]] included (1) the undisputed opinion of a physician affiliated with the Cleveland Clinic that Callahan suffers from an aggressive immunodeficiency that makes him especially vulnerable to infection from COVID-19 and its potential effects; (2) the failure and inability of the Bureau of Prisons ("BOP") to diagnose and properly treat Callahan for his deteriorating

---

[1] Parenthetical references preceded by "A" are to the Appendix filed herewith.

3

condition; and (3) other severe consequences to Callahan and his family caused by the pandemic that could not possibly have been anticipated at sentencing.

We acknowledge this Court's usual deference to District Judges in exercises of discretion, especially in wielding the Act's newly-minted "monumental" power. *See Brooker,* 976 F.3d at 230. But Judge Brown expressly applied the restrictive standard for review rejected by *Brooker*. *See, e.g.*, A125. He cited in support of his denial an opinion of another District Judge, *United States v. Ebbers*, 432 F. Supp. 3d 421, 430-31 (S.D.N.Y. 2020) (Caproni, U.S.D.J.), which also applied the restrictive standard rejected by *Brooker*. A129-30.

Judge Brown was new to the case. Callahan's emergency motion was filed after the death of his sentencing Judge, the Honorable Arthur D. Spatt, requiring random reassignment. Judge Brown plainly did not appreciate the scope of the necessary review. He did not permit oral argument or conduct any fact-finding and rejected Callahan's offer to speak directly to the Court. *See* A30. While Judge Brown deferred to Judge Spatt's rulings on Callahan's prior applications for post-conviction relief, Judge Spatt had himself never conducted oral argument or any fact-finding on those prior applications, and the government had never submitted any declaration or affidavit in opposition to those prior applications nor to the motion under the Act below. Judge Brown denied and was

4

dismissive of Callahan's motion, but failed to conduct the type of fulsome inquiry required by the Act:

• The District Court believed a qualifying medical condition was one "from which Defendant may not recover" [A128], which is not the correct standard as *Brooker* explains;

• The District Court summarily rejected the unopposed opinion of Callahan's medical opinion without a sound basis for doing so; and

• The District Court failed to conduct its own analysis under Section 3553(a), adopting Judge Spatt's earlier rulings [A1-2, 129-30], but a resentencing, especially one done by a Judge new to the case, requires that the analysis be done anew.

Judge Brown's denial of Callahan's motion was thus arbitrary and an abuse of discretion not supported by a sufficient record to qualify for the Court's deference. Had Judge Brown fully and fairly considered all of Callahan's proffered circumstances, and perhaps even permitted Callahan and counsel to address the Court's concerns, Judge Brown would have had a proper basis to determine if the skepticism expressed in his denial of Callahan's application was truly justified, and at least create a proper record for this Court's review in determining if appellate deference is warranted.

The Relevant Facts

*1.      Callahan's Emergency Application*

In January 2018, Callahan began serving a 144-month sentence imposed by Judge Spatt at FCI Danbury.  Upon Callahan's request to be transferred to a prison camp closer to home that would facilitate visits with his wife and twin teenagers (who live in Nassau County), he was transferred to a unit of the Metropolitan Detention Center ("MDC") known as the "cadre," reserved for defendants assessed as very low security risks.  A30.

Callahan's emergency application to Judge Brown in June 2020 was occasioned by convergence of the COVID-19 pandemic and Callahan's progressive deterioration apparently caused by an autoimmune deficiency.  Callahan had earlier been diagnosed with Dupuytren's Disease, a chronic syndrome.  As Callahan explained in his initial submission in support of his emergency motion,

> An autoimmune disease is a condition in which your immune system mistakenly attacks your body.  The immune system normally guards against germs like bacteria and viruses.  When it senses these foreign invaders, it sends out an army of fighter cells to attack them.  Normally, the immune system can tell the difference between foreign cells and your own cells.  In an autoimmune disease, the immune system mistakes part of your body, like

6

your joints or skin, as foreign.  It releases proteins called autoantibodies that attack healthy cells."[2]

A30-31.  The Center for Disease Control and Prevention ("CDC") identifies immunocompromised people at higher risk of contracting and becoming severely sick from COVID-19.  As the CDC advises, "[i]f you are immunocompromised, the best way to prevent COVID-19 is to avoid being exposed to this virus."[3]  A31.

A manifestation of Dupuytren's syndrome is Dupuytren's Contracture, a tightening of the flesh beneath the skin of the palm causing permanent bending of the fingers.  Before the pandemic, in early November 2019, the MDC arranged for Callahan to have surgery on his (dominant) right hand to address his Dupuytren's Contracture.  After the surgery, however, still before the pandemic, the MDC did not arrange for Callahan's required follow-up visit nor the required physical therapy.  Due to the MDC's lack of post-surgery follow-up, Callahan suffered an infection, requiring an emergency hospital admission.  As a result, Callahan began losing the use of his right hand.  He was specifically told by MDC medical staff, as described hereinafter, that the MDC would not care for his hand any time soon.  A31.

---

[2]    Available at *https://www.healthline.com/health/autoimmune-disorders*.

[3]    Available at *https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/ immunocompromised.html*.

7

Meanwhile, Callahan's disease began to spread to, among other parts of his body as described below, his feet and left hand, indicating that the syndrome was progressing. Callahan's urgent requests at the MDC for medical help were denied or ignored. The following is a summary of some of Mr. Callahan's emails to the MDC submitted to Judge Brown in support of Callahan's motion:

*April 29, 2020*: Mr. Callahan complained that the MDC's failure to arrange for a post-surgery follow-up visit to the hospital resulted in an infection and emergency hospital admission; atrophy has set in to his hand; and he is not receiving the requited therapy: "I am concerned I will no longer be able to ever use my hand as a result."

*May 1, 2020*: "I am not receiving proper medical care at MDC with respect to my Dupytrens Disease and the atrophy in my right hand directly due to MDC's failure in the post surgery follow up (according to both the surgeon and Mr. Plagairos from MDC medical)."

*May 6, 2020*: "[W]ithout the proper medical [care] I will not regain full use [of] my right hand. This is a serious situation."

*May 11, 2020*: "[I] cannot do the proper therapy care on my own . . . This falls under urgent/essential medical care - having use of my hand is essential . . . . My hand is debilitated due to MDC's failure to bring me back to the surgeon/hospital for the required post surgery follow up work, notwithstanding the fact that I repeatedly asked/begged for help. Now my hand is a mess and my healthcare has been abandoned. None of the above is in dispute. Abandoning my healthcare needs while in BOP custody is not an answer or an option."

*June 8, 2020*: "[T]he range of motion, circulation and coloring of my hand is very poor. As of this time I have yet to see or hear from [the doctor]."

8

*June 8, 2020*: "[T]he whole hand is a purple/graying color seven months post surgery because I have not been getting the required therapy."[4]

A31-32.

By email dated May 6, 2020, MDC medical staff advised Callahan that all "elective/nonvital procedures and therapy" were shut down because of the pandemic, there is no place offering outpatient physical therapy, and it would take six weeks to route the request, which BOP's regional office would ultimately reject anyway. A32.

Callahan's risk was heightened by conditions at the MDC conducive to spread of infection [A32], a fact which could not reasonably be disputed. *See, e.g, Chunn v. Edge*, 20-CV-1590, Docket No. 72 (E.D.N.Y.) (class action in which a medical expert expressed alarm about the MDC's failure to implement simple safety procedures; "gross deviations from adherence to correctional standards of care and CDC guidance;" and even destruction of inmate medical complaints known as sick-call requests). Callahan was prepared to testify before Judge Brown

---

[4] Judge Brown should have called out the government for claiming in its memorandum in opposition below that Callahan had not complained of any medical issues in the period before the government submitted its opposition [A51], but Judge Brown instead embraced the canard. Callahan had been adamantly begging for help, but was told, when the MDC deigned to respond to him, that it "cannot help [him]." A101.

9

about his progressively worsening health and, if in dispute, his firsthand information about the deteriorating conditions at the MDC.  A30, 35.

Callahan presented no security risk at all.  He was at the lowest possible security level; for example, he was permitted to leave the MDC without supervision and assist with maintenance of the facility's vehicles before the pandemic.[5]  If released, Callahan was prepared to be confined to his family's home in Nassau County, be quarantined as required, and comply with any period of home confinement that the court deems necessary as a condition of release.  A32-33.  More, as discussed below, he could contribute to the community upon release by assisting his wife with a home care agency in Nassau County that they established before his surrender.

2.    *The Government's Opposition*

The government in its memorandum in opposition pressed the limited view of the scope of review for motions of this type rejected by *Brooker*.  *See, e.g.*, A47-49. Within the context of the narrow review urged by the government at odds with *Brooker*, it pressed three principal arguments:

- Callahan's motion was inadequate because he failed to provide supporting documentation from a treating physician or medical expert that his condition

---

[5]  Callahan has since been transferred to a satellite prison camp at FCI Schuylkill in Pennsylvania, where he is currently detained.

10

was truly autoimmune and made him vulnerable to infection from COVID-19 and its consequences [A50-51];

• Judge Spatt had found it appropriate to sentence Callahan to a term of imprisonment of 144 months (of which he had (at the time) served only about 30 months) [A38-39, A54]; and

•  While Callahan was a first offender whose crime was financial, the nature of the offense outweighed any countervailing arguments upon application of the statutory sentencing factors of 18 U.S.C. §3553(a) [A53-56].

3.      *Callahan in Reply Addressed the Government's Objections*

Callahan submitted a robust reply to the government's memorandum in opposition [A58-122], attempting comprehensively to address each of the government's arguments:

•  Responding to the government's objection to the absence of any supporting medical opinion, Callahan submitted a declaration from an impeccably-credentialed medical expert which underscored the urgency of Callahan's condition [A107-12];

• Addressing the length of the sentence as imposed, Callahan explained that the pandemic was serving to deny him "earned time credits" ("ETC's") established as part of the First Step Act, which would likely result in reduction of at least half of the sentence imposed by Judge Spatt [A69-70]; and

• Responding to the government's analysis of the statutory sentencing factors, Callahan submitted comprehensive declarations addressing the severe consequences to his family [A103-05, 117-21], which Judge Spatt could not possibly have foreseen, as well as the irreconcilable gap between the government's rhetoric about Callahan's crime and the reality.

11

The government could have sought permission to submit a sur-reply in response to Callahan's substantial reply, but it did not, presumably because it did not dispute the medical expert's declaration or any of Callahan's other representations of fact or was otherwise content to rest on the existing record.

a.    *The Medical Opinion of Mark Shoag, M.D.*

To address the government's argument that Callahan had not provided a supporting medical opinion, Callahan in reply submitted a declaration from Mark Shoag, M.D. [A107-12], a doctor of internal medicine associated with the Cleveland Clinic[6] with forty years of experience.  A graduate of the Yale University School of Medicine and Columbia University, Dr. Shoag has practiced in Connecticut and Ohio and recently obtained licensing in other states to facilitate tele-health visits during the pandemic.  A107.

While Callahan's confinement at the MDC prevented Dr. Shoag from conducting an in-person examination, he was provided information from Callahan's counsel and about Callahan's medical records maintained by the Bureau of Prisons (which Callahan had not himself been able to obtain until after his initial

---

[6]  The Cleveland Clinic, a non-profit academic medical center, is ranked as the second best hospital in the United States (after the Mayo Clinic).  A107 (*citing https://my.clevelandclinic.org/about).*

submission to Judge Brown).  Dr. Shoag opined that Callahan's ailments are consistent with an autoimmune disease, and that he is at increased risk of infection from COVID-19 and becoming gravely ill if he gets it.  A107-12.

As Dr. Shoag explained, Callahan suffers from Dupuytren's Disease in both his right and left hands and from a constant throbbing/burning pain in his medial right elbow.  He also has nodules on the bottom of both of his feet, a condition that can take different names, including plantar fibromas.  Callahan's hands and feet cause him significant pain and distress every day:  using his hands is difficult and painful; walking is painful; and eating and brushing his teeth can only be accomplished with his left hand (which also has contracted fingers caused by Dupuytren's Disease) because his dominant right hand is atrophied as a result of Dupuytren's (and the MDC's failure to care properly for Callahan even before the pandemic).  A108-10.

Dr. Shoag explained that these conditions are due to an abnormal growth of collagen.  The MDC had confirmed this diagnosis, noting in Callahan's medical records that he suffers from "localized connected tissue disorder."  Dr. Shoag opined that, "with any condition involving abnormal growth of collagen, an autoimmune disease is suspected."  A109.

13

Additional conditions further led Dr. Shoag to conclude that Callahan's condition is consistent with the presence of an autoimmune disease. A109. Callahan's right hand is discolored and gets cold and tingly. The MDC's Dr. Bialor confirmed this condition in a note from June 2020: "right hand has become red and cold compared to the left hand." Dr. Shoag explained that these symptoms indicate the presence of Raynaud's disease, an autoimmune disease of the blood vessels. Again, this condition is corroborated by the MDC's Dr. Bialor, who noted that Callahan suffers from a "disorder of arteries and arterioles." Callahan also experiences dry mouth and dry throat, sometimes finding it impossible to keep his mouth and throat moist, making it hard to swallow and tickling his throat. Dr. Shoag opined that these symptoms indicate Sjogren's syndrome, another autoimmune disease. A109-10.

Dr. Shoag concluded that Callahan's various symptoms, considered together, "are more consistent with an autoimmune disease than independent causes." Dr. Shoag noted that these "several symptoms could also indicate the presence of diabetes, which is also considered to be an autoimmune disease." A110. He explained that "an autoimmune patient is both more likely to contract a virus like COVID-19, and more likely to become seriously ill from the virus" because an autoimmune disease causes certain cells and proteins that normally play

14

an important role in the body's immune system to attack healthy cells mistakenly. Cells and proteins are therefore "(a) not available to fend off attacks by true foreign substances such as viruses and bacteria; and (b) the damage they cause to the body's own tissues create a haven for viruses and bacteria to lodge in and to propagate." A110-12

Callahan's emergency motion [A62] cited Judge Brown to other cases that granted compassionate release during the pandemic based on similar conditions. *United States v. Sanchez*, 2020 U.S. Dist. LEXIS 70802, *4-*5; *13 (D. Conn. Apr. 22, 2020) (defendant with 40% of his sentence remaining suffered from Raynaud's syndrome and lupus, described as "an inflammatory connective tissue disease" and a "systemic autoimmune disease:" "Mr. Sanchez's compromised immune system means that he is less capable of warding off infection, and if he contracts COVID-19, is more likely to experience a severe and rapidly escalating case, which would impair the ability of the staff at MDC Brooklyn to identify and respond to Mr. Sanchez's medical needs"); *United States v. Hope*, 2020 U.S. Dist. LEXIS 130617, *10 (S.D. Ga. July 22, 2020) (defendant with seven years left on her sixteen-year sentence suffered from a constellation of medical conditions, including rheumatoid arthritis, Sjogren's disease - which the court described as an "immune system disorder" - and finger and feet deformities,

15

finding that "[w]hile any one of Hope's health conditions, on its own, might not qualify as 'a serious physical or medical condition,' the Court is satisfied that the constellation of medical conditions from which she suffers, especially during the COVID-19 pandemic, does constitute a serious physical and medical condition").

Callahan's constellation of medical conditions has been recognized as an autoimmune disease in other contexts. For example, in *Nielsen v. Wilkie*, 2019 U.S. App. Vet. Claims LEXIS 1232 (Vet. App. July 16, 2019), the Veteran's Appeal Board determined that Nielsen manifested symptoms of "scleroderma, Raynaud's disease, Sjogren's syndrome, Peyronie's disease, and Dupuytren's contractures" and had "an autoimmune disease of unspecified diagnosis." Dr. Shoag testified in support of Nielsen's diagnosis, which is how Callahan's counsel found him. A107-08.

One House of Congress already believes that inmates like Callahan should be immediately released. *See* A62. The Health and Economic Recovery Omnibus Emergency Solutions Act (the "HEROES Act"), passed by the House of Representatives, provides that inmates, like Callahan, who are at least 50 years-old or have a "weakened immune system," be released to community supervision

during a pandemic. *See* H.R.6800, 116th Cong., 2d Sess.[7] Callahan will thus be immediately released if the Senate signs on to this provision of the HEROES Act, but *Brooker* makes clear that Judge Brown was not required to wait and thereby risk grave harm to Callahan.

The government claimed in its memorandum in opposition that the MDC had offered to provide Callahan "the necessary physical therapy," and that his failure to accept the offer proved that his emergency application was contrived [A51], but the government's claim was wrong, misleading, and largely irrelevant. Physical therapy could at best rehabilitate Callahan's right hand, but it would neither shield him from COVID-19 nor address his deteriorating condition.

The government's claim, however, was not true. Callahan had been repeatedly told by independent (non-BOP) health professionals (for example, when his post-surgery infection required an emergency trip to a hospital) that *one year* of physical therapy was required. A98. Before the onset of the pandemic in March 2020, Callahan had received a total of two to three hours of therapy which had been inadequate and ineffective. A98-99. On June 16, 2020, the MDC offered to send Callahan to an inpatient facility for a maximum of an additional two weeks of

---

[7] Available at: *https://docs.house.gov/billsthisweek/20200511/BILLS-116hr6800ih.pdf*, pp. 1688-1689.

17

physical therapy, but the MDC would not say whether Callahan's presence at the facility would pose a risk of infection, nor would the MDC identify the facility in advance so that his wife or attorney could help him determine whether an inadequate two weeks of additional therapy was worth a risk of infection. A103. Judge Brown embraced the government's cynicism and neither asked the parties any questions nor conducted any fact-finding to determine the truth. A129.

Whatever can be said about BOP's ability to address the pandemic generally, the record below demonstrated that BOP is not equipped to address Callahan's unusual condition and failed to do so even before the pandemic, contributing to loss of functioning of Callahan's dominant hand. A98-103. Compassionate release is sometimes the only viable solution for vulnerable inmates, even if in the care of the most well-meaning officials of a prison where no COVID-19 cases have been reported. At the least, a Judge should conduct a proper inquiry so a ruling is based on facts. *See, e.g., United States v. Schafer*, 2020 U.S. Dist. LEXIS 86834, *15 (W.D.N.Y. May 18, 2020) ("While the Government cites to steps undertaken by the BOP to prevent the spread of COVID-19, and its apparent success in doing so at Allenwood (Low) FCI [which had reported no case of COVID-19 at that time], the reality is that Defendant's preexisting medical conditions make him uniquely vulnerable to the virus, and if it spreads to the

overcrowded facility where he is housed, it may be too late once the introduction

of the virus into the facility is known"); *United States v. Rountree*, 2020 U.S. Dist.

LEXIS 91064, *24 (N.D.N.Y. May 18, 2020) (compassionately releasing

defendant from FCI Schuylkill, even though the facility reported no case of

COVID-19 because the court was "not willing to take [the] risk" of waiting);

*Wragg v. Ortiz*, No. 20-5496, 2020 WL 2745247 (D.N.J. May 27, 2020) (denying

class action by inmates at FCI Fort Dix, while acknowledging that at least ten of

the facility's inmates had already been compassionately released, and noting that

"class members arguably have an interest in being able to submit individual

petitions for compassionate release immediately, highlighting their particular

conditions and suitability").

"[T]he threat of COVID-19 to those in prison [itself can] constitute . .

. an extraordinary and compelling reason for compassionate release." *United*

*States v. Pacheco*, No. 12-CR-408, 2020 U.S. Dist. LEXIS 134510, at *2

(S.D.N.Y. July 29, 2020) (Furman, J.). *See also United States v. Zoquier-Solano*,

No. 13-cr-772, 2020 U.S. Dist. LEXIS 142598 (S.D.N.Y. Aug. 10, 2020) (Oetken,

J.) ("The COVID-19 pandemic poses health challenges that are themselves

extraordinary. The novel coronavirus has infiltrated many of the BOP's prisons

and jails, affecting inmates and staff. The nature of prisons - crowded, with shared

19

sleeping spaces and common areas, and often with limited access to medical assistance and hygienic products - put those incarcerated inside a facility with an outbreak at heightened risk") (internal citations omitted).

   b.  *Mr. Callahan's Extraordinary and Compelling Family Circumstances*

   *Brooker* made clear that District Judges are not limited in the types of family circumstances that may be considered as extraordinary and compelling warranting compassionate release.  *See United States v. Riley*, 2020 U.S. Dist. LEXIS 82909, at *6 (D. Vt. May 12, 2020) (compassionately releasing defendant to enable him to care for his father, noting that "[s]ince the First Step Act amendments, courts have taken a broader view of family circumstances justifying compassionate release"); *United States v. Bucci*, 409 F. Supp. 3d 1 (D. Mass. 2019) (compassionately releasing defendant to enable him to care for his ailing mother, holding the strict letter of U.S.S.G. § 1B1.13 (which did not specifically provide for release to care for a parent) not dispositive since enactment of the First Step Act).  *See also United States v. Lisi*, 2020 U.S. Dist. LEXIS 31127, at *13 (S.D.N.Y. Feb. 24, 2020) (compassionately releasing defendant who was required to care for his mother given "the apparent incompetence or neglect of [the mother's] hired aides and her daughter's . . . inability or complete aversion to helping her"); *United States v. Thaqui*, No. 1:11-cr-00486, Docket No. 2031

20

(E.D.N.Y. June 16, 2020) (compassionately releasing 49-year-old defendant because of his vulnerability to COVID-19 in light of his "medical condition that attacks his immune system and has caused him to lose the sight in one eye," and because of compelling family circumstances, namely that the caregiver of the defendant's children was suffering from terminal illness); *United States v. Blye*, 2020 U.S. Dist. LEXIS 101795, at *12-13 (W.D. Wash. June 9, 2020) (compassionately releasing defendant held at facility that reported no COVID-19 cases based on "holistic" consideration of defendant's circumstances, including a constellation of medical issues and "compelling family circumstances," namely that defendant was "involved in dependency proceedings for his five-year-old daughter," had "shown a desire to turn his life around and to care for his child," and could risk losing his parental rights altogether if he was not released).

It is not just that Judge Brown failed to address the "full scope" of the family circumstances, but he disregarded them entirely. When Callahan surrendered to serve his sentence in January 2018, he and his wife Sheri resolved to do everything possible for Callahan to remain a constant presence in the lives of their teenage twins. The family's frequent visits to Callahan first to FCI Danbury and subsequently to the MDC, and Callahan's almost daily calls home, were indispensable. A93-94, 117. But the COVID-19 pandemic changed everything for

21

the Callahans in a way that no one could have expected. Callahan's children last saw him in February 2020 (and have not seen him since). Because of prison lock-downs and increased demand on limited telephones during the pandemic, there are often long periods during which Callahan cannot call home; he essentially disappears. A103-04, 118.

The result has become psychological torture for the Callahans, especially Callahan's fifteen year-old daughter. Callahan's daughter was diagnosed with attention deficit hyperactivity disorder in March 2019 and with obsessive compulsive disorder more recently. Since September 2019, her disabilities have required special accommodations at school. Her anxiety often makes her physically ill. Tantrums and extreme behaviors have escalated; she twice punched a window cutting her hand, and had to be taken for emergency care on one of the occasions. She is unduly anxious that something will happen to her father. When she is in crisis, she cannot be left alone for fear that she might harm herself. A103-04, 118-20.

Callahan's daughter met with a psychologist, but it did not help her, and refused to see a second psychologist. A104, 118-19. It was not long after the onset of the pandemic that she declined into severe depression. She stopped joining her remote school classes (zoom classes had by then begun); she stopped

22

regularly showering or changing clothes; and she frequently skipped meals. As for Callahan's teenage son (the daughter's twin), anger has consumed him; the pandemic has denied the boy an opportunity to see or hug his father since February 2020. A119-20.

Before Callahan surrendered, he and his wife Sheri established a home care company, headquartered in Lake Success, called 7 Day Home Care (http://7dayhomecare.com/) ("7 Day"), which Sheri now owns and operates. 7 Day provides companionship and non-medical support services to the infirm and elderly at private residences, assisted living communities, and nursing homes. 7 Day employs about eight caregivers and serves about fifty clients at a time. Since Callahan surrendered, Sheri works a minimum of seventy hours per week, including weekends. She suffers from her own health issue, a condition known as vestibular labyrinthitis which causes extreme dizziness and vertigo and which confines her to bed a few times each year. A113-16, 120.

When the pandemic hit in March 2020, Sheri was on the frontlines of the crisis. The services provided by 7 Day were designated essential by order of the Governor. At a time when most New Yorkers were trying to avoid nursing homes and assisted living facilities, 7 Day continued to care for its patients. 7 Day cared for patients returning home after surviving COVID-19, and provided

23

terminal care for other patients in private homes, allowing them to avoid hospitals during the pandemic and be with their loved ones for as long as possible. Because Sheri has no viable alternative to care for the twins, she has had to balance her essential role as a *de facto* single parent with the demands of a job she needs to support them, while working with people directly affected by the COVID-19 crisis. A115-17.

It is true that collateral consequences are not unusual to families of defendants serving sentences. But the circumstances here are plainly exacerbated by the pandemic, including Callahan's deteriorating medical condition, as well as the ongoing inability of Callahan's children to see him, which Judge Spatt could not possibly have foreseen.

> *e. The District Court Ignored the First Step Act's Earned Time Credit Program, Which Itself Might Have Reduced His Sentence by at Least Half but for the Pandemic*

The District Court appeared to accept the government's suggestion that Callahan had served too little of his 144-month sentence to qualify for compassionate release. The District Court thereby ignored a provision of the First Step Act, which affords inmates like Callahan an opportunity to earn credits from in-custody employment that would substantially reduce the actual time imposed. *See Goodman v. Ortiz,* 2020 U.S. Dist. LEXIS 153874 (D.N.J. Aug. 25, 2020)

(explaining the program). The government's position exaggerated the true amount of Callahan's remaining time in custody, and also ignored the pandemic's effect on the program and attendant frustration of congressional intent.

Callahan began serving his 144-month sentence on January 16, 2018. A91. With good time credit (54 days for every year of his imposed sentence of 12 years, 18 U.S.C. § 3624(b)), Callahan's expected release is April 2028.[8] Beginning in January 2020, amendments implemented by the Act provided that inmates like Callahan (incarcerated for an economic crime and in a minimum security risk category) earn an additional fifteen days of ETCs per month of "successful participation in evidence-based recidivism reduction programing or productive activities." 18 U.S.C. § 3632(d)(4)(A). ETCs are applied toward time in custody, including release to home confinement or a residential reentry center (*i.e.* a halfway house), or supervised release. 18 U.S.C. § 3632(d)(4)(C).

Since Callahan surrendered to serve his sentence in January 2018, but before the pandemic, he consistently participated in BOP activities (and will continue to do so as available). A92, 96. It was thus anticipated that he would earn fifteen days of ETCs per month beginning January 15, 2020, thereby reducing

---

[8] *See* https://www.bop.gov/inmateloc/ (consulted Aug. 17, 2020; confirmed Dec. 12, 2020).

25

his remaining time in custody in at least half, to between three and four years. *See* 18 U.S.C. § 3624(g).

Because of the pandemic, however, BOP activities were suspended. A92, 96. Callahan was thus penalized by the absence of ETCs, and the government compounded the prejudice by ignoring the program in advising Judge Brown of the time that Congress truly intended he remain in custody. Judge Brown failed to consider this reality, which itself qualified as another extraordinary and compelling circumstance supporting Callahan's motion. *See, United States v. Kissi*, 2020 U.S. Dist. LEXIS 118956, at *39-40 (E.D.N.Y. June 26, 2020) ("While Kissi was transferred to the MDC in order to participate in a program that would allow him relatively more freedom of movement [] instead, he now finds himself, for public health reasons, on near-constant lockdown, without access to educational and rehabilitative programs, and unable to receive social visits"); *United States v. Smith*, 2020 U.S. Dist. LEXIS 129218 (W.D. Pa. July 20, 2020) (counting in favor of defendant's compassionate release that his participation in BOP's residential drug abuse program (RDAP) was stalled because of the COVID-19 pandemic, which would have moved up his release date by one year).

*f*. *The District Judge Failed to Conduct the Required Resentencing*

As this Court made clear in *Brooker*, District Courts are in a "unique position to determine whether the circumstances warrant a reduction" under the Act. *Brooker*, 976 F.3d at 237. Judge Brown's application of the wrong standard contributed to undue deference to Judge Spatt's rulings (which were themselves issued without oral argument, fact-finding or affidavits in opposition). The District Court in *Brooker* denied the defendant's motion in that case, characterizing the motion as significantly based on a "complaint that his sentence was too long in the first place." This Court interpreted the District Court's language as "a court applying a rule that constrains it." *Id.* So here.

Judge Brown's denial expressed an unsupportable cynicism about Callahan, whom his Honor has never met. Callahan in reply responded to the government's harsh inferences about his character and his crime as part of the government's discussion of the case and analysis of the statutory sentencing factors. Apart from requesting that an opportunity to address the Court, Callahan submitted a declaration expressing his "deep remorse to all parties affected by [his] actions in this case" and "accept[ing] complete responsibility for [his] actions and failures." A90. As Callahan explained, he began working hard to make amends even before his surrender. He immersed himself day and night to building 7 Day,

27

visiting the infirm and elderly, matching patients and caregivers, and responding to frequent emergencies around the clock. He was described by one family members of two patients as having responded "to people's needs for home healthcare with more caring and sensitivity than [she] could possibly have imagined" and that he had "truly given himself to this field, offering comfort both emotional and actual, during the most horrific times." A90, 113-15.

Callahan's work at 7 Day was one of his vehicles for redemption. His contrition is plainly genuine:

> Having been incarcerated now for 31 months, I have had a lot of time to think about why I ended up here. There is not a day that goes by when I don't feel the clout of remorse in the pit of my stomach. I am still distraught thinking of the grief that I caused to investors and to my family. Even more so now than I did the day of my sentencing, I fully recognize why I became involved in the criminal activity that led to my incarceration: I was selfish, dishonest, and greedy. I have worked every day to purge these flaws from my being and to reconcile with who I am without them. I believe that I am a now a very different person than I was when I committed the crimes that led to my incarceration, and a different person than I was when I was first incarcerated in January 2018.

A91.

Callahan has been a model inmate. He has spent his time in prison productively, even before he could earn ETCs for doing so. Callahan has taken about twenty classes offered by BOP, including a victim impact class and a class related to child care. He has attended several classes offered by a professor from

28

Columbia University in anthropology, history, and western civilization, and other classes on topics such as physical education.  He has been trusted with various jobs in prison.  While at FCI Danbury, at BOP's request, Mr. Callahan taught several classes to his fellow inmates, including courses to help inmates obtain their Graduate Equivalency Degrees ("GED") and writing.  At the MDC, again at BOP's request, he taught GED classes, and also taught English as a second language.  He was also a teaching assistant to some of the classes taught by the Columbia University professor.  As part of the facilities crew, he maintained vehicles, painted, and installed flooring.  He was permitted to leave the MDC regularly without supervision to do so.  He has paid restitution every month.  A91-92.  The government conceded (as it must) that Callahan does not present a danger to the community.

Compassionate release cannot be based on rehabilitation alone, but rehabilitation can support relief when combined with other circumstances, such as those described above.  *See, e.g., United States v. Marks*, 2020 U.S. Dist. LEXIS 68828, at *21-22 (W.D.N.Y. Apr. 20, 2020) ("Congress has [] stated that 'rehabilitation . . .  alone' may not be considered an extraordinary and compelling reason for reduction of sentence.  While that clearly forecloses relief based solely on a defendant's efforts toward rehabilitation, it implies that rehabilitation is a

29

factor that a court may consider in conjunction with other relevant circumstances"); *United States v. Millan*, 2020 U.S. Dist. LEXIS 59955 (S.D.N.Y. Apr. 6, 2020), at *21 ("legislators' use of the modifier 'alone' evidences that they believed that rehabilitation is relevant to the question of whether a sentence should be reduced and that rehabilitation, when considered together with other equitable factors, could constitute 'extraordinary and compelling reasons' for a sentence reduction").

More, it was undisputed that the pandemic itself and other recognized conditions at the MDC had made Callahan's confinement far worse than Judge Spatt could have anticipated. *See, e.g.*, *Zoquier-Solano*, 2020 U.S. Dist. LEXIS 142598 at *5 ("the pandemic creates a significant danger of the Court's previously imposed incarceratory sentence being 'greater than necessary' to comply with the purposes of sentencing"); *Sanchez*, 2020 U.S. Dist. LEXIS 70808 at *16-*17 ("The sentencing purpose of 'just punishment' cannot warrant a sentence that includes exposing a particularly vulnerable individual to a life-threatening illness which threatens him uniquely"); *Pacheco*, 2020 U.S. Dist. LEXIS 134510 at *5 (the conditions of confinement "have included any number of serious restrictions designed to stem the spread of the virus . . . have been far harsher than the Court had reason to believe they would be"); *United States v. Arango*, 2020 U.S. Dist.

30

LEXIS 113059, at *5 (S.D.N.Y. June 26, 2020) ("the need for general deterrence has [] been addressed by [defendant]'s substantial time served" and the "several months served with the grave risk of illness posed by COVID-19 to those in prison"); *United States v. Brown*, 2020 U.S. Dist. LEXIS 90187, at *9 (E.D. Pa. May 22, 2020) ("Brown's poor health and other underlying conditions put her at great risk of serious illness or death if she were to contract COVID-19. The Court is sympathetic to the anxiety and emotional distress that inevitably flows from the threat of COVID-19 in prison, especially to a person who is immunocompromised and suffers from respiratory illness.  Under such circumstances, the need for punitive measures can be accomplished in a shorter period of time."); *United States v. Kissi*, No. 13-CR-51, 2020 U.S. Dist. LEXIS 118956, at *39-40 (E.D.N.Y. June 26, 2020) ("Kissi's motion comes before this Court during a public health crisis that has transformed American life in nearly every respect. In addition to the unprecedented health risks the COVID-19 pandemic presents to incarcerated individuals, including individuals who, like Kissi, may be at elevated risk for complications should they contract the virus, the pandemic has also altered the conditions of confinement in significant ways. While Kissi was transferred to the MDC in order to participate in a program that would allow him relatively more freedom of movement [] instead, he now finds himself, for public health reasons,

31

on near-constant lockdown, without access to educational and rehabilitative programs, and unable to receive social visits").[9]

On this type of motion pursuant to the Act, the defendant's characteristics *at the time of resentencing* must be considered. *See, e.g. Brown*, 2020 U.S. Dist. LEXIS 90187 at *8 (compassionately releasing defendant who had served five years of a fifteen-year sentence for a fraud that had resulted in $7 million in losses, finding that §§ 3553(a)(1) & (a)(2) weighed in favor of release because the characteristics and health of the defendant had changed significantly since her original sentence); *United States v. Karr*, 2020 U.S. Dist. LEXIS 27149, at *21, *25 (E.D. Ky. Feb. 18, 2020) ("[i]n essence, the § 3582 gateway calls for careful remeasuring, to the extent the factors yet apply, given the changed circumstances . . . The compassionate release statute does not require that the Court hear the death rattle before acting"); *United States v. Jackson*, 2020 U.S. Dist. LEXIS 71601, at *19-20 (S.D. Tex. Apr. 23, 2020) ("Mr. Jackson's history and characteristics have changed since sentencing because his chronic diseases have progressed and his health further deteriorated. Under the Guidelines, an

---

[9] Callahan also experienced the MDC's notorious winter power outage [*see* Office of the Inspector General U.S. Department of Justice, "Review and Inspection of Metropolitan Detention Center Brooklyn Facilities Issues and Related Impacts on Inmates" (Sept. 2019) *available at https://oig.justice.gov/reports/2019/e1904.pdf*].

"extraordinary physical impairment," of the sort under which Mr. Jackson now suffers, "may be a reason to depart downward." U.S.S.G. § 5H1.4. This is especially true at the present moment because Mr. Jackson's serious health problems place him at high risk of serious illness or death from COVID-19, which is spreading through our nation's prisons like wildfire").

Callahan also took substantial issue with the government's unsupportable and exaggerated claims about his crime. A84-87. It was not a Madoff-style *Ponzi* scheme as the government claimed, and no fact-finding (there has been none in this case) has ever come close to so establishing. While Callahan does not deny the seriousness of his crime, his crime was making misrepresentations about the fact of actual investments in the Panoramic View, a resort in Montauk owned by Callahan's brother-in-law. It would be a very unusual Madoff-style *Ponzi* scheme indeed that produces $120.8 million in credits for investors, credits expressly acknowledged by the government at Callahan's sentencing. A86-87. Credits of $120.8 million were *$24.8 million more than the estimated value of the Ponzi scheme in Callahan's plea agreement based on identical facts.* The investment in the Panoramic View was real, as were the investments made in Callahan's various investment funds. In fact, the government's sale of the forfeited Panoramic View produced a *profit* for investors,

33

as the government at sentencing acknowledged: "the defendant illegally diverted approximately $38 million of investor monies to the Panoramic. The government recovered approximately $40.3 million from the sale of the Panoramic." A87. That investors made money from Callahan's investment in the Panoramic View was an important fact that the Court should have considered. In fact, *Brooker* expressly teaches that consequences of the pandemic coupled with an excessive sentence are in the Act's wheelhouse [*Brooker*, 976 F.3d at 238], but Judge Brown deferred to Judge Spatt's previously-imposed sentence without the type of inquiry required.

Of the 6,390 defendants whose primary offense was fraud in the year 2017 (the year Callahan was sentenced), the average sentence was 26 months (which Callahan has already served), and the median sentence was 16 months.[10] Callahan's sentence was closer to the average sentence for sexual abuse (137 months) and child pornography (147 months).[11] A87. Judge Brown was obliged to consider these statistics in evaluating the § 3553(a) sentencing factors, namely the

---

[10] U.S. Sentencing Commission Quarterly Data Report for the Year 2017, p. 9, available at *https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC-2017_Quarterly_Report_Final.pdf*

[11] *Id.*

34

"need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. 3553(a)(6). *See, e.g., United States v. Haynes*, 2020 U.S. Dist. LEXIS 71021, at *6-7 (E.D.N.Y. Apr. 22, 2020) (counting in favor of defendant's compassionate release that the average sentence imposed on defendants convicted of similar and other crimes, as reported by the United States Sentencing Commission, was much below defendant's sentence; where, for the year 2019, the average sentence for robbery was 109 months, the average sentence for child pornography was 103 months, and the average sentence for murder was 255 months, the defendant, convicted of robbery, had been sentenced to 46.5 years (558 months) and had already served 27 years (324 months)). If a resentencing court can find that a lenient original sentence weighs against compassionate release, *e.g., United States v. Elliott*, 2020 U.S. Dist. LEXIS 136583, *19 (E.D.N.Y. July 31, 2020), the opposite is also true. Here, Mr. Callahan's original sentence was particularly severe, and the government's opposition to his compassionate release was based on rhetoric that was never proved as fact.

35

4.      Judge Brown's Application of the Wrong Standard and Arbitrary Ruling

Judge Brown summarily denied Callahan's motion, expressly adopting the restrictive standard urged by the government.  *See, e.g.,* A125, 129-30.  He did not discuss many of Callahan's arguments and was unduly dismissive of others.  Thus, for example, addressing Dr. Shoag's opinion and Callahan's family circumstances, Judge Brown relied on restrictive language found by this Court in *Brooker* inapplicable to motions under the Act.  The following excerpts from Judge Brown's opinion clearly show that he believed he was confined to the restrictive standard of the Application Note, which *Brooker* rejected as the controlling standard:

> [I]t appears that none of the circumstances articulated by defendant satisfy the threshold requirements of extraordinary circumstances.  To be clear, defendant is not suffering from a terminal illness, does not meet the age and service requirements, and is not facing extraordinary family circumstances, as described in subsections (A)(i), (B) and (C) of the Advisory Note to U.S.S.G. § 1B1.13(A)(i).
>
> . . . .
>
> [T]he subjective symptomology reported by defendant does not approach the language set forth in the Advisory Note to § 1B1.13.

A 126, 129.  The Judge even found Callahan's proposed release plan as inconsistent with "a serious physical impairment from which one is not expected to recover" [A128], which *Brooker* explains is not the proper standard.

36

Judge Brown's response to Dr. Shoag's medical opinion was especially untenable and tortured.  Though Callahan submitted Dr. Shoag's opinion to address the government's opposition, Judge Brown criticized Callahan for submitting it in reply and bemoaned the absence of the government's input on Dr. Shoag's opinion [A127] without noting (1) the government's decision not to seek sur-reply, which left Dr. Shoag's opinion unrebutted; or (2) his own power to conduct an inquiry or at least ask the government why it had remained mum.

More, Judge Brown rejected Dr. Shoag's opinion as too speculative and not based on an "actual diagnosis" [A128], when the very basis of Callahan's motion was BOP's refusal to diagnose, get to the bottom of his constellation of ailments, and treat him properly.  If the District Court was not comfortable granting relief on Dr. Shoag's unrebutted opinion alone, its answer was to ask questions, not cast Dr. Shoag aside, but Judge Brown approached Callahan's motion with the wrong legal frame of reference from the start.

## SUMMARY OF THE ARGUMENT

Defendant-Appellant Brian Callahan supported his motion in District Court for compassionate release under the First Step Act with (1) an undisputed expert medical opinion of an impeccably-credentialed physician that Callahan suffers from an aggressive immunodeficiency that makes him especially vulnerable

37

to infection from COVID-19 and its potential effects, and which the Bureau of Prisons is unwilling or unable to diagnose and properly treat; and (2) evidence of unanticipated extraordinary circumstances occasioned by the pandemic that were causing severe harm to his family and resulting in loss to Callahan of "earned time credits" under the First Step Act, which Congress intended would substantially reduce sentences of defendants like Callahan.

At the government's express urging, the District Court applied an erroneous and restrictive standard of review rejected by this Court in *United States v. Brooker (Zullo)*, 976 F.3d 228 (2d Cir. 2020), and declined to consider or was unduly dismissive of the extraordinary and compelling reasons proffered by Callahan in support of relief. The District Court was randomly assigned to rule on Callahan's motion, and summarily denied Callahan's motion based on earlier rulings of Callahan's deceased sentencing Judge without oral argument, fact-finding, or his own fully independent analysis of the statutory sentencing factors under 18 U.S.C. § 3553(a).

### ARGUMENT

The District Court's denial of Callahan's emergency motion was expressly based on the wrong standard, which had expressly been urged by the government in opposition. *Brooker* explains that Application Note 1(D) to

38

U.S.S.G. § 1B1.13 "cannot constrain district courts' discretion to consider whether any reasons are extraordinary and compelling" [*Brooker*, 976 F.3d at 236], but the District Court believed that it was so constrained and considered Callahan's motion through a confined and narrow prism.

As *Brooker* explains, "compassionate release" is itself a misnomer, as the Act authorizes District Judges to release a defendant or reduce a defendant's sentence. "The only statutory limit on what a court may consider to be extraordinary and compelling is that rehabilitation *alone* shall not be considered an extraordinary and compelling reason." *Brooker*, 976 F.3d at 237 (quotation marks and ellipses omitted; emphasis in original). It is precisely for this reason that the Act was considered "monumental:" Congress and the Executive believed that too many people did not need to be incarcerated, but left it the Judiciary to consider proffered circumstances and whether to grant relief a case at a time. Judge Brown did not exercise this authorized discretion and did not appreciate that his Honor had it to exercise.

The District Court's approach to Dr. Shoag's opinion was at odds with both the law and the reality of the extraordinary circumstances precipitating the motion. Its approach was at odds with the law because it expressed the belief that a medical condition could qualify for relief under the Act only if the defendant was

39

not expected to recover. Its approach was at odds with the reality of the circumstances because BOP was unwilling or unable to diagnose and treat Callahan's condition, which made him especially vulnerable to infection from COVID-19 and its potentially grave consequences. If the District Court is correct, Callahan has no recourse but to wait for infection and serious illness, but in the words of one Judge, the Act "does not require that the Court hear the death rattle before acting." *United States v. Karr*, 2020 U.S. Dist. LEXIS 27149, at *21, *25. Even the government did not claim that Dr. Shoag's opinion was "too speculative," as did the District Court; instead, the government said nothing about Dr. Shoag's opinion, animating the inference that the government had nothing in opposition to say.

Dr. Shoag's opinion, as well as the consequences caused by the pandemic to Callahan's family, their inability to see Callahan, his lost of ETCs, and the sincerity of his contrition, were all advanced with declarations, but the District Court wrapped it all up as just another "attempt to challenge the sentence imposed" [A124], instead of the broad inquiry which the Act authorizes and requires. It is not the rare case, and in fact embraces a broad swath of cases, that a defendant who moves for compassionate release has previously applied for post-

40

conviction relief, and there in no basis in law for the latter to be a reason for denying the former.

Nor was it enough for the District Court to rely on the procedural history of the case and Judge Spatt's earlier rulings. Where a different Judge rules on the motion than imposed sentence, the resentencing judge must provide his or her own fulsome analysis and discussion of the Section 3553 factors, not just rely on the earlier Judge:

> When compassionate release motions are decided on the papers - as they often are - appellate courts cannot glean district judges' factual findings from hearing transcripts or other record items as is possible in our reviews of traditional sentencing decisions. We require judges to write more extensively in *§ 3582(c)(1)(A)* decisions where the record bears little indication that the district judge considered all the defendant's evidence and arguments before granting or denying compassionate release. *Ruffin,* 978 F.3d 1000, 2020 WL 6268582, at *7 (citing *Chavez-Meza 138 S. Ct. at 1966-67*). **The obligation to explain is imperative when the original sentencing judge and the compassionate release decision judge are different persons, as the original sentencing transcript does not reflect the latter judge's factual reasons for their § 3582(c)(1)(A) decision.** *Cf. Keefer*, F. App'x, 2020 U.S. App. LEXIS 32723, 2020 WL 6112795, at *4 (describing the "common scenario" where "the district judge who sentenced the defendant is the same judge who considers the defendant's **[*28]** reduction-of-sentence motion" and thus "will *already* have considered and balanced the § 3553(a) factors the first time around at the original sentencing").

*United States v. Jones*, 2020 U.S. App. LEXIS 36620 at *27, 33 fn 25 (6th Cir. Nov 20, 2020) (emphasis added).

41

As the Seventh Circuit has explained, a separate and independent analysis is required where a different Judge resolves the motion than imposed sentence because of the different posture of the case, and because earlier arguments may have been pressed or considered with different frameworks and sensibilities in mind. *United States v. Shaw*, 957 F.3d 734, 741-42 (7th Cir. 2020). Callahan's motion presented a variety of factors for the District Court to consider mostly based on the pandemic, which Judge Spatt could not possibly have anticipated; the District Court defeated the purpose of the Act by deferring to and defending Judge Spatt, rather than looking at the case anew.

In *Shaw*, as here, "because the district court did not hold a hearing on the motion, we lack a corresponding transcript that might further supplement the court's explanation. That silence leaves us without assurance that the district court considered [the defendant's] arguments, even if it didn't ultimately find them persuasive." *Id.* at 742 ("we cannot confidently say that, had the district court taken [the defendant's] arguments into account, the court would have decided as it did").

42

<u>Conclusion</u>

For these reasons, the District Court's order should be vacated and the

case remanded for proper consideration of Callahan's motion.

Dated: December 14, 2020

/s/Andrew J. Frisch
Jolene LaVigne-Albert
Schlam Stone & Dolan LLP
26 Broadway
New York, New York 10004
(212) 344-5400

*Attorneys for Brian Callahan*

43

Certificate of Compliance With FRAP 32(A)

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 8,810 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14 point font.

Dated:   New York, New York
          December 14, 2020

                                        Respectfully submitted,


                                        /s/Andrew J. Frisch
                                        Jolene LaVigne-Albert
                                        Schlam Stone & Dolan LLP
                                        26 Broadway
                                        New York, New York 10004
                                        (212) 344-5400

                                        *Attorneys for Brian Callahan*

44